**AIRLINE MOTOR COACHES, Inc., v. CAVER.**

No. 4480.

Court of Civil Appeals of Texas. Beaumont.

June 23, 1949.

Rehearing Denied July 13, 1949.

Strasburger, Price, Holland, Kelton & Miller, Dallas, for appellant.

Fulmer & Fairchild, Nacogdoches, for appellee.

WALKER, Justice.

The cause is before us on plaintiff's second motion for rehearing. Upon the grounds hereinafter stated, that motion is sustained; and the previous opinions filed in this cause are accordingly withdrawn and this opinion is substituted instead. The previous opinions will remain a part of the record, however.

J. J. Caver brought this action against Airline Motor Coaches, Inc., to recover damages for personal injuries sustained by his wife, Jessie Nora Caver, on July 5, 1944, while a passenger on one of Airline's motor buses. Mr. Caver is referred to hereinafter as plaintiff, and Airline, as defendant.

Plaintiff alleged that a radio fell out of the luggage rack in defendant's motor bus and struck his wife upon the head, injuring her seriously. He alleged further that these injuries resulted from the negligence of the operator of the bus in one or more of the following respects, namely, in permitting the radio to be carried into the bus (because the operator should have realized that the radio might be placed in the rack and that it might fall out and injure some one, as it did), and in failing to remove the radio from the rack although he either knew or ought to have known that it had been placed in the rack, to the danger of the passengers.

Defendant's answer need not be stated.

Plaintiff's theories of negligence were submitted to a jury, and in response to various Special Issues the jury found: (1) Plaintiff's wife sustained personal injuries on the occasion in question by being struck by a portable radio falling from the rack above her head; (2) defendant's bus driver was negligent in permitting the passenger to take such portable radio into the bus; (3) such negligence was a proximate cause of the injuries plaintiff's wife sustained on the occasion in question; (4) Special Issue 4 and the answer thereto read as follows: "Do you find from a preponderance of the

evidence that Defendant's bus driver knew that the portable radio had been placed upon the rack above Mrs. Caver's head in time so that he could have removed the same from the rack before it fell? Answer 'Yes' or 'No'." Answer: "No."; (5) and (6). These issues were conditioned upon an affirmative answer to Issue 4 and were not answered; (7) Issue 7 and the jury's answer thereto read as follows: "Do you find from a preponderance of the evidence that the portable radio was upon the rack above Mrs. Caver's head for a sufficient length of time before it fell so that the bus driver by a reasonable inspection could have discovered it in time to remove it from the rack before it fell? Answer 'Yes' or 'No'". Answer: "No". (8), (9) and (10). These Issues were conditioned upon an affirmative answer to Issue 7 and were not answered. (11) Plaintiff, by reason of his wife's injuries, had been damaged in the sum of $6625.00; (12) the fall of the radio from the rack was not an unavoidable accident; (13) the act of the passenger in placing the portable radio upon the rack above the head of plaintiff's wife was not a new and independent cause of the injuries plaintiff's wife sustained on the occasion in question.

On this verdict, the trial court rendered judgment for plaintiff against defendant in the sum of $6625.00, and defendant has appealed.

The trial court's judgment depends upon the finding under Issue 2 that the operator of defendant's motor bus was negligent in allowing the radio to be carried into the bus; and under Point 1, defendant says in effect that this finding is not supported by the evidence. We adhere to our former holding that defendant's Point 1 raised this issue of law. Our reasons are already before the parties and will not be repeated. However, we reverse our former holding that Point 1, so construed, should be sustained; and we now hold to the contrary.

There was evidence of the following matters, some of which are no longer thought to be material:

(1) On July 5, 1944, plaintiff's wife (referred to sometimes in this opinion as Mrs.

288

Caver) bound for Beaumont over defendant's bus line, took passage at Nacogdoches on a motor bus operated by defendant and rode in that bus to Kirbyville. There defendant transferred her to another bus which defendant operated, and which had come to Kirbyville from Marshall, and she rode in this bus to her destination, via the town of Silsbee. Mrs. Caver could not obtain a seat on the bus she entered at Kirbyville until after this bus had departed from Silsbee; but some passengers left the vehicle a short distance beyond Silsbee, and Mrs. Caver then sat down in a temporary seat which had been placed in the aisle dividing the permanent seats in the bus. The bus then proceeded along the route for a few miles, and while Mrs. Caver was seated in this aisle seat, a "portable" radio fell out of the luggage rack attached to the wall of the bus and struck her on the head. There is conflicting testimony as to the effect of the blow on Mrs. Caver, but the finding under Issue 11, awarding plaintiff's damages of $6,625.00 has not been attacked. Mrs. Caver said that she suffered a temporary loss of consciousness. The driver said that he did not know of this incident until one of the passengers signaled him to stop. He then stopped the bus, went back to Mrs. Caver's seat and talked with her, and finally gave her a medicine, apparently to prevent or to reduce the pain she suffered from the blow. This done, he proceeded on to Beaumont, where Mrs. Caver left the bus.

: (2) There is a conflict in the testimony concerning the size, shape and weight of the radio. According to Mrs. Troutman, plaintiff's witness, it was square, or almost square, and was about 14 or 15 inches wide. Mrs. Troutman made some difficulty about estimating the weight, but finally testified that: "If I were to guess I would guess 15 pounds, or maybe 20 pounds". She referred to it as a medium size portable radio. She did not have it in her hands, and did not know what it was made of. The driver said that it was a small portable radio in a brown plastic box, measuring 7½ or 8 inches "long", 5½ or 6 inches "deep", and about 4 inches "up and down". He said that he had held the radio in his hands, and he thought that it weighed 6 or 7

pounds. He said that the owner left the bus in Beaumont, carrying it under his arm. Mrs. Donnell, defendant's witness, confirmed to some extent his testimony as to the size of the radio.

(3) The bus on which plaintiff was riding carried two kinds of seats for the passengers, regular and temporary. It seems that there were seven rows of regular seats behind the driver. The first six rows were divided by an aisle; but the seventh row extended across the rear of the bus. In addition, provision was made for six temporary seats which were placed in the aisle, filling the gaps made by the aisle in the rows of regular seats. It was necessary to lift these aisle seats for one to pass along the aisle. As previously stated, plaintiff sat in an aisle seat.

Above the rows of regular seats on Mrs. Caver's right there was a luggage rack attached to the wall of the vehicle, which extended from the wall toward the aisle. According to the driver's testimony this rack was 2 feet and 4 inches wide, with a rim 2½ inches high next the aisle, and 5 inches above this rim was a rope. The bottom of this rack was about 14 inches higher than Mrs. Caver's head as she sat in her seat (so that, considering the respective heights of rim and rope, the radio fell perhaps 17, perhaps 22 inches, before striking Mrs. Caver, depending on whether it slipped underneath or tipped over the rope).

What space within the bus, other than the luggage rack, was available for the stowage of the radio? There was a luggage compartment in the rear of the bus, evidently separated from that part of the bus in which the passengers rode; but if the owner did not surrender his radio to the driver of the bus he could only keep it in his hands, or place it upon the floor of the bus between the seats, or beneath his seat. There was ample proof that he could not have put it in one of the seats of the bus after Mrs. Caver boarded the bus; for according to Mrs. Caver, all seats were filled and she was compelled to stand in the front of the bus from the time she boarded it at Kirbyville until some passengers left it after it had passed through Silsbee. The driver said of the trip from

Marshall to Kirbyville that the bus was full at times and of course when it was full, the radio could not have been placed in a seat of the bus.

What space was available at the owner's feet or beneath his seat? The record exhibits the following items of proof:

(Item a): Mrs. Caver testified: "Q. Some suggestion was made awhile ago how somebody could have knocked something down on you with their elbow. Did anybody do that? A. No. Q. Did you see anybody walk on the luggage careless? A. No. Q. *There was plenty of room for people to walk inside the seats and get it?* A. Yes." In our original opinion, we referred to the words italicized as indicating that the radio could have been placed between the regular seats. The jury could have construed the quoted testimony as showing only that a passenger could stand between the regular seats and take luggage out of the rack. This fact, of course, does indicate to some extent the space between two rows of regular seats.

(Item b): Defendant's bus driver testified on direct examination by defendant: "Q. Will there be a difference between the top of the jump seat and the top of the others? (*Jump seat* refers to the seats in the aisle of the bus) A. Yes, about 2 inches. In the aisle seat they will be 2 inches lower. Q. What was the height of the top of the jump seat from the floor? A. Fifteen inches." He testified almost immediately afterwards, while still on direct examination by defendant's counsel, as follows: "Q. Did you make any other measurements? A. From the floor to the cushion there would be an offset on each side of seventeen inches. Q. That the regular seats are on? A. Yes. Q. And what about the jump seat? A. It is 2 inches lower." This latter statement must be interpreted; what did the driver mean by "an *offset* on *each side*"? Perhaps he implied that the seat rested upon a pillar instead of upon supports at the sides of the cushion. Furthermore, these two statements apparently conflict. The first statement is evidence that "the height of the *top* of the jump seat" from the floor was 15 inches, which means that the *top* of the regular seat was 17 inches from the floor.

The second statement is evidence that "from the floor to the cushion" of the regular seat was 17 inches. Did *top* refer merely to the *bottom* of the cushion? The second statement so indicates. Or did "from the floor to the cushion" mean to the *top* of the cushion? We originally construed this testimony as proof that there was 17 inches of space beneath a regular seat in which to stow the radio; but we have concluded that the construction of this testimony was a matter for the jury to determine.

(Item c): Mrs. Donnell, defendant's witness, testified: "A. When he (referring to the bus driver) got on and told you where your first stop would be and what time we were due in Beaumont, he made the remark that everybody take care of their luggage and set it in the seat with them. They wouldn't let anybody carry big luggage without it was checked. He told everybody to *put their small luggage down at their feet or in the seat with them.*" The words italicized indicate somewhat the space between two rows of regular seats.

Under this proof and that previously stated concerning the size and shape of the radio, it was a question of fact whether the radio could be stowed *beneath* a regular seat but whether it could have been put down upon the floor between two rows of regular seats, if it was as large as Mrs. Troutman said, cannot be determined.

(4) The person who had the radio in his possession, described as a soldier, became a passenger and brought this radio into the bus at a place called Tatum through which the bus passed before arriving at Silsbee. He left the bus at Beaumont, Texas. He did not testify and he was not otherwise identified.

For how long a time was this soldier on the bus before the radio fell? Mrs. Caver's testimony raised the issue that he was in the bus when she entered the bus at Kirbyville; and that he was seated in one of the regular seats next to a window, at the end of the row in which Mrs. Caver's seat was placed. When Mrs. Caver sat down, he was on her right-hand side and was separated from her by Mrs. Donnell. There

was evidence to the contrary, but it need not be summarized.

■ We also cite the following testimony of defendant's bus driver concerning some testimony he had given on a previous trial of this cause: "Q. Do you remember any of these statements you testified to at that time: 'Q. And at no time during that distance of 175 miles from Tatum to Silsbee did you find this radio upon this rack? A. No.' A. *Correct.*" The driver's answer ("Correct") might only have meant that he remembered making the previous statement but under the circumstances, it might have meant more. The driver's testimony on the trial now under review shows that he did not know the radio was in the luggage rack before it fell. His statement on the previous trial was strictly in accord with this position; and in such a case the matter testified to on the present trial being important and prominent in the minds of the actors, the jury had a right to infer from the form of the driver's answer ("Correct") not only that the driver meant by this answer to affirm his having made the previous statement but also that he meant the answer to be an affirmation that the previous statement was true. The driver, of course, could have known how far it was from Tatum to Silsbee, since he drove the bus over that distance; and we think the item of testimony just quoted should be given some weight as proof that the soldier had ridden upon the bus for a distance in excess of 175 miles before the radio fell.

■ The driver saw the radio in the soldier's possession when the soldier entered the bus, and according to the driver, he asked the soldier to put the radio into the luggage compartment at the rear of the bus. However he said that he consented to the soldier's retaining possession of the radio under instructions from him not to put the radio into the luggage rack, but, instead, to hold it upon the lap or to put it upon the next seat. The driver's testimony shows further that the soldier at least indicated a willingness to comply with this request, although the driver seems to have resented the form of the soldier's reply. ("A. He said O.K. Skipper, good boy'. Q. He called you 'skipper'? A. Like a lot of smart guys would.") The driver's testimony concerning this transaction is not consistent in all of its parts nor is it always clear. It affords a basis for inconsistent interferences concerning his purpose in telling the soldier not to put the radio into the rack. The jury could have found that he was only attempting to protect the radio tubes against a possible fracture, or that he was attempting to avoid a claim against defendant for damages if the radio was injured; but they could also have found that he was afraid the radio would fall out of the rack and injure a passenger. We agree with plaintiff that the jury had the right to disbelieve the driver's testimony that he had the discussion with the soldier concerning the radio which he says he had. We adhere, of course, to our conclusion that this right to disbelieve testimony would not support an affirmative finding that the discussion never occurred or that the driver never gave the soldier instructions concerning the radio; but this holding is of no practical consequence. It is of consequence that the driver's testimony proved defensive matters.

(5) The testimony of defendant's driver shows that he did not know that the radio had been placed in the luggage rack until after he had stopped the bus and gone back to talk to plaintiff's wife.

It cannot be determined when the radio was placed in the rack, but there is some testimony from which it can be inferred that it was not put into the rack until after plaintiff's wife sat down in the aisle seat. If the jury gave no weight to the driver's testimony that he inspected the luggage rack at Silsbee and that he did not see the radio in the rack at that time, it seems to us that the jury also could have found that the radio was placed in the bus before Mrs. Caver boarded the bus at Kirbyville; but this construction of the proof was evidently rejected by the jury.

■ The time available to defendant's driver for discovering that the radio was in the rack depended, of course, upon when the radio was placed in the rack. If the jury believed that the radio was not placed in the rack until after plaintiff's wife

sat down in the aisle seat, then this period must have been short. We note that Mrs. Caver said that after she got a seat the bus traveled 5 or 10 miles before the radio struck her, but her estimate must be a rough one. Defendant's driver said that the incident occurred 5½ or 6 miles beyond Silsbee, indicating a still shorter interval than that plaintiff's wife had in mind. The findings under Issues 4 and 7 are supported by the evidence; indeed, no attack has been made upon them.

There is no evidence that the driver inspected the luggage rack *after he left Silsbee*. Defendant had a rule in force that he inspect the rack whenever the bus stopped, and he does not say that he inspected the rack when he made the stop beyond Silsbee to discharge passengers to which plaintiff's wife referred (when she secured the aisle seat). He testified instead: "Q. Silsbee is about like Center? A. Small. Q. That was when you made your last inspection with reference to everything in the bus? A. Yes."

Under the conditions existing in the bus, the driver could not have determined whether the radio was in the rack—prior to the time it fell upon Mrs. Caver—without stopping the bus, standing up and looking back into the interior of the vehicle. There is no proof that he did this. There was a mirror inside the bus which afforded the driver a view of the interior of the bus as he sat at the wheel, but this mirror showed only the bottom of the rack, which thus prevented his seeing what was in the rack. He testified: "Q. When you permitted the soldier to put it on there, you knew then if it was put on the rack, you couldn't see it thru the mirror without looking around? A. Yes." His use of this mirror was necessarily limited by the necessity he was under of keeping his view fixed on the road as he operated the bus, and he so testified.

Defendant had a rule in force prohibiting the carriage of radios in the luggage rack. The purpose the rule was designed to accomplish was not fully proved, but it was a proper matter of inference, from the testimony quoted immediately below, in the absence of testimony showing a more restricted purpose, that the falling of the radio from the rack was one of the eventualities intended to be guarded against, whether defendant enacted the rule to prevent injury to the radio—as seems most likely—or whether the rule was also intended to prevent injury to passengers. This testimony is also clear evidence that defendant's driver knew and feared that a radio in the luggage rack might fall out of the rack. He testified: "Q. You knew it was a rule? A. Yes, sir. Q. You knew it might fall off and that was the reason you remonstrated with him about it? A. Yes. Q. You gave him your consent if he would keep it in his lap? A. He said, 'O.K. Skipper, good boy'". The driver gave some testimony to the contrary, but the jury had a right to believe this just quoted.

Of course, if it be said that defendant's driver anticipated that the radio might fall from the rack, then, with passengers in the aisle he certainly ought to have anticipated that a passenger might be injured if the radio fell.

(7) What caused the radio to fall? There is no proof of any unusual movement of the bus or of any jolt or jar, and had the radio been seated squarely upon the floor of the luggage rack it could not have been lifted or tipped over the 2½ inch rim of the rack by any other than an unusual movement or jar. Plaintiff's wife testified: "Q. As you were riding along on the bus, the bus was being driven in a normal manner? A. I never noticed anything out of the ordinary." The proof respecting the construction of the luggage rack indicates that the radio fell because it was improperly stowed, and that it was placed upon some other object in such a way that the rim of the rack and the rope running above that rim would not keep it in place. There is some testimony from Mrs. Donnell which supports this inference. She testified that she saw the radio in the rack before it fell (although she did not fix the time she saw it there), and that it was on top of "suit cases and things". The rack seems to have had many things in it at Silsbee.

(8) Defendant had no representative, agent or employee on the bus other than the driver, and the driver was the only

person available to operate the bus, see after the passengers and luggage, and enforce defendant's rules governing the operation and use of the bus.

### Opinion

(1) Defendant supports Point 1 by the argument that the driver of the bus had no right to take the radio from the owner's possession without the owner's consent, that the owner had the absolute right to carry the radio into the bus with him, and that the finding under Issue 2 (that defendant's driver was negligent in permitting the passenger to take the radio into the bus) is accordingly without support in the evidence. The trial court's judgment, as we have stated, depends upon this finding.

This contention is overruled. The opinions in Houston Electric Co. v. Bragg, reported at Tex.Civ.App., 264 S.W. 245 and 276 S.W. 641, indicate some limitations upon the passengers' right to retain possession of his baggage. The passenger certainly has no right to keep his baggage with him if the circumstances indicate that it will be a source of danger to other passengers, and the proof shows the existence of such circumstances here.

(2) Plaintiff says that the decision just cited is in point here and that it supports the judgment of the trial court. We need not determine whether the decision applies here or not, for the circumstances now to be stated support the trial court's judgment.

We have referred to the proof showing that the driver of defendant's bus had no assistant and that he could not operate the bus and also keep watch over the interior of the bus. In fact, he could not see the interior of the luggage rack from where he sat.

We have also referred to proof showing that the driver knew that if the radio entered the rack it might fall out, and that defendant had enacted a rule requiring him to keep the radio out of the rack. The driver was bound to anticipate from these facts that some one in an aisle seat, as Mrs. Caver was, might be hurt; and we think that he was certainly bound to anticipate that a passenger might sit in an aisle

seat. After all, the defendant had provided these aisle seats for the use of passengers, and the crowded condition of the bus, not only from Kirbyville on past Silsbee, but also from time to time, between Marshall and Kirbyville, indicates a heavy demand for transportation which the record does not trace to any temporary and fortuitous cause. The driver contracted to carry the radio and its owner over a distance exceeding the 175 miles between Tatum and Silsbee. Under such circumstances, it is not unreasonable to require the driver of defendant's bus to keep in mind the possibility that the aisle seats would be used.

The only remaining question, then, is whether the driver ought to have expected the owner of the radio to put the radio into the rack. In our previous opinions, we held that he need not, primarily because there was proof that another place was available for the stowage of the radio which was as safe and convenient a place as the rack. We also attached significance to the driver's testimony that he had instructed the owner not to put the radio into the rack and that the owner had manifested some willingness to comply. We are now of the opinion that we erred in so holding; the proof raised an issue of fact as to whether the driver should have anticipated that the radio would be placed in the luggage rack.

The luggage rack itself is the weightiest fact supporting this conclusion. This rack would not have been in the bus if defendant had not intended it to be used, and the only use it could serve was for the stowage of baggage. There was nothing about the rack which indicated that the radio ought not to be placed in the rack. A passenger who did not know of defendant's rule and who did not have the driver's experience might very reasonably have thought this rack a proper place in which to stow his radio. Further, he might also have very reasonably have thought that the radio would be as safe from harm in the rack as upon the floor of the bus or elsewhere. Further, the rack was certainly a convenient place of deposit, and this convenience was heightened by circum-

stances. For the crowded condition of the bus and the length of the owner's journey meant that the owner could not keep the radio on the seat beside him; and whether as large as plaintiff's proof shows or as small as defendant's proof shows, the radio must have proved burdensome if the owner had kept it in his hands or upon his lap. Perhaps the radio could have been placed between the seats or beneath the owner's seat. The proof really does not show whether the radio could have been put down upon the floor in front of its owner's seat, as it must have been if the bus was crowded, and we shall therefore assume that it could have been. We now think it a question of fact, whether the radio could have been placed beneath the owner's seat, either in whole or in part, but let us suppose that it could have been placed there. Let us even suppose that the radio was as small as defendant's driver said that it was. None of these details are of controlling significance because the rack was an open invitation by the defendant to the owner to put his radio into the rack if he so desired, which the owner might reasonably have thought he could safely accept, and it seems to us that the smaller the radio was, the more likely, that the owner would put it in the luggage rack. Acceptance of such an invitation ought to have been anticipated by the carrier. Why should not the owner do this?

The only reason for his not doing so which this record exhibits is expressed in the testimony of defendant's driver, who said that he warned the owner not to put the radio into the rack and that the owner manifested some willingness to comply with his instruction. However, the jury were not bound by this testimony. On this record, they had a right to reject this testimony of the driver and to reject statements by defendant's other witnesses which might be thought confirmatory of the driver. They could not make an affirmative finding to the contrary, but the charge of the trial court did not require them to do that. The matters to which the driver testified were defensive; a passenger could not be expected to know defendant's rules and the experience of defendant's drivers unless defendant notified these facts to the passenger. Having rejected this testimony, the jury could answer Issues 2 and 3 as if they had no such testimony before them, that is, as if the defendant had not adduced proof of instruction and of a willingness to comply; and this conclusion makes all of our previous comments applicable.

It is a necessary consequence of what we have said that the driver of defendant's bus ought not to have allowed the radio to be carried into the bus, and that the findings in response to Issues 2 and 3 were supported by the evidence. We must accordingly set aside our previous judgment and consider the merits of defendant's Point 2, which assigns error to an argument addressed to the jury by plaintiff's counsel. We agree with plaintiff that Point 2 should be overruled. It does not appear from the record that the driver had any conversation with the soldier in the presence of the other passengers, and it seems most likely that any evidence the passengers could have given, other than the three who testified (plaintiff's wife, Mrs. Troutman, who testified for plaintiff, and Mrs. Donnell, who testified for defendant), would have been relevant only to Issues 4 and 7. The jury answered these Issues in favor of the defendant. The facts respecting the nature and severity of the blow Mrs. Caver sustained were in proof, and the passengers not called would probably have given only cumulative testimony. It seems to us that if the argument was erroneous, the error could have been cured by an instruction from the trial court, directing the jury to disregard the argument. The record shows that plaintiff requested such an instruction, and that defendant apparently resisted this request. Under these circumstances, the defendant lost the right to complain of this argument.

The contention that the finding under Issue 2 is general and is controlled and limited by the more specific findings under Issues 4 and 7 is overruled. These Issues submitted different theories of negligence, founded upon different duties.

The previous judgment of this court reversing the judgment of the trial court and rendering judgment in behalf of defendant is set aside; and judgment is now rendered affirming the judgment of the trial court.

COE, C. J., dissents.

On Rehearing.

Appellant's motion for a rehearing overruled.

COE, C. J., dissenting.